22-50690 Texas State LULAC v. Alphon, et al., and Torres, et al., and first we'll hear for General Paxton, Mr. Wilson. Good morning. May it please the Court. After full discovery in this case, and even though SB 1111 has been the law of Texas for over a year, plaintiffs have not identified a single voter who has been harmed by the provisions of SB 1111 in this challenge. Plaintiffs themselves can't vote, and they can't complain of a violation of their non-existent right to vote. These disconnects create fatal mismatches among the claims the plaintiffs are bringing, the harms they seek but fail to establish for purposes of standing, and the relief they obtain. So I'll tell you, I think the closest point here is organizational standing for a purpose, I'm just speaking for myself, with respect to the diversion of resources. So as I understand it, there's two injuries alleged for organizational standing, and one is the chilling speech, and the other one is the diversion of resources. So the hardest point for you, from my perspective, is that there is testimony that there was some diversion of resources as a result of SB 1111, if I got that right. So what's your response to that? Sure, and I'd be happy to address that testimony. I think the most important point is that they completely failed to disaggregate sort of what's because of SB 1111, what's because of SB 1, what's because of the sort of dozen other election laws the Texas legislature passed in the last session, and also what election laws were passed in other states. Voto Latino's deposition testimony is very clear that they're upset about laws passed in Arizona and Georgia. And because they can't disaggregate that, it's not clear that they have actually diverted any resources because of SB 1111. Well what decision says they have to, as you put it, disaggregate the resources? Well I think that runs to the nature of the injury in fact. If they haven't diverted resources because of SB 1111, I don't think there's an injury in fact for purposes of organizational standing. You know, if Your Honor's not convinced by that, I think it's also ... No, I'm just asking. Well, I mean, another way to ask it would be, do they have to show that they, I mean, is it sufficient to show that they diverted some resources to defend against 1111? I think if they had clear testimony that they had diverted some set of resources, absolutely 100 percent because of SB 1111 and not because of all of these sort of intervening causes, I think that probably would be sufficient. You know, sort of predominating our other arguments just on this point, I mean, I want to be clear that we think this is also sort of self-inflicted and we think they're also engaged in sort of the regular business of what they do, which this Court said in the El Paso v. Trump case is not sufficient. But just for purposes of this inquiry, I mean, to sort of flip it on its head, we're not saying they have to come up with a particular dollar figure. We're not saying the particular dollar figure has to be large. I mean, the Supreme Court has been very clear that you can establish standing, you know, with minimal harms and you don't have to say it's, you know, $1,000,000.75 or anything like that. But what we do have to say is that this is the law that clearly caused you harm. As far as chilled speech, the resident's position, again, just like Judge Duncan, speaking for myself, it's very broad, a former legislator probably could have been better written, but it wasn't. It's what the legislature passed. But they say, the plaintiffs, as I ascertained their position, we don't even know how to explain this bill. We don't have the law. We don't even know how to tell voters, prospective voters, whether they can or can't register. It prohibits a wide swath of political activity, protected speech, et cetera, but we can't talk about the bill because of it. So how is that not chilled speech if they can't explain or don't know what to do or how to fulfill their mission? Several points on that. I mean, I think the first thing I would do is refer you to how the Secretary of State interprets the law. How are we going to give deference to the Secretary of State who came up with an interpretation, seems a little bit at odds with the text of the statute itself, but also is in the context of litigation? It wasn't rule promulgation. Well, I would also refer you to what the Secretary of State's put on his website with regard to his general guidance with regard to the resident's provision, which we've cited in the brief. That guidance basically says this changes the definition of, SB 1111 changes the definition of residency, but it does not cause voter registrars to do anything differently. That is to say, voter, and I think that Ms. Longoria's testimony was pretty clear on this. The voter registrars, this doesn't change what the voter registrars do. They don't sort of inquire into an individual's motives. Well, no, they get the application. Sure. I'm going to sign this voter up. It's an address. Everything else is valid. Registered voter. Sure. So somehow later, I guess, prosecutors, whether it's the AG or the DAs or whoever it is, prosecutors come in and say, but it's not a valid residence under this provision of SB 1111 because you registered to vote for the purpose of influencing the outcome at election. So again, that goes, I mean, it strikes me that somebody in Texas can enforce the law and it strikes me that the plaintiff's argument is, well, we can't, we can't protect against that because we don't know what the law means, what it covers. And we know some of what it covers is constitutional activity, protected activity. Well, I mean, maybe I can get at that a slightly different way. To show a chilling effect, you need to show a reasonable likelihood that there's going to be some kind of enforcement. You know, there are some cases like Fenves that say you can presume that. I think those are all regulated parties. Plaintiffs are not regulated by SB 1111. SB 1111 regulates voters. And so I think, I think our strongest point on the chilling effect is the sort of long chain of causation that sits between an individual, them giving advice to someone, and then sort of a hypothetical prosecution. I mean, they would have to, they would have to knowingly or intentionally give bad advice because 13.007 of the election code, the portion of the election code they're pointing to, has a mens rea requirement that's knowingly or intentionally. Someone's then going to have to go register to vote or fill out a voter registration in a way that violates the statute. That's then going to have to be referred by the election administrator, presumably to the district attorney, because under State v. Stevens, without a referral, the attorney general can't prosecute these. Somewhere in there, the DA is going to have to discover that these people gave bad advice, that the plaintiffs gave bad advice, and then he's going to have to, then the DA is going to have to prosecute the plaintiffs. So I mean, I think there would be cases like Clapper, I'm sorry, Your Honor. I was just going to say, effectively, what almost would have to be proven is that they told the voter to register to go influence an election or something along those lines, because what you're saying is, as far as the harm or the risk or the constitutional activity, it all lodges with the voter, not the organization. Well, I think it's certainly true that what SB 1111 regulates is voting. I don't think SB 1111 regulates these sort of other types of political activity. I think that inheres both in the text itself, what the legislature's getting at. It also inheres in the fact that they've sued these county election administrators. County election administrators don't have anything to do with where I or any other person might go volunteer for an election or something like that. And I would just step back and say, on the merits of the residency provision, because I think that's where they're spending most of their time, I'm happy to discuss the merits of the other case too, we really do think that it simply prohibits moving to a false address. I mean, if you look at the text, if you move for purpose of influencing an election, it's almost necessarily not a true address. So you can move, as long as you make a bona fide move, it's perfectly fine. What if somebody moves from D.C. to help a candidate in Texas run their campaign and they intend to stay there and vote during the election cycle? If it's a bona fide residence and they intend to stay, absolutely. But they move there to work on a campaign, which is surely influencing an election. Well, I don't think that any part of SB 1111 is reaching to sort of moving, is sort of reaching to prevent anyone from moving to work on a campaign, nor do I think it could. I think this is getting at sort of a separate point, which is how long does, what sort of counts as temporary for some of these provisions? I think that also, it also runs the temporary relocation provision. Really it adheres to an individual's intent because your residence is your domicile, the place you intend to stay. So it's very common for someone to move for a year for work or something like that. If you've made a bona fide move, that's your residence for purposes of Texas voting law. You don't have to sort of intend to stay into perpetuity. That's sort of not consistent with the modern world. Thank you, Mr. Wilson. I see I'm out of time. You have time for rebuttal. Thank you. Ms., is it next, is Ms. Patterson next for Lupe Torres? Ms. Patterson, good morning. May it please the court, my name is Autumn Hammett Patterson and I'm representing intervener appellants, Torres and Penley. All the plaintiff's claims should have been dismissed for lack of Article 3 and statutory standing. Because the court got a little in the weeds about Article 3 standing with Mr. Wilson, I will focus on statutory standing. But first I want to take a step back and quickly highlight how plaintiff's case differs from many of the cases on which they rely to argue Article 3 standing. And that is, plaintiffs are not regulated by the statutory provisions that they challenge and those statutory provisions do not facially restrict plaintiff's activity. Accordingly, Clapper and Zimmerman are the appropriate analogs to this case. And those cases demonstrate that plaintiffs lack Article 3 standing. They have not shown it was necessary to divert the resources to avoid a reasonably certain injury that would incur to them and they have not shown a credible threat of prosecution. Now regardless, even if plaintiffs had Article 3 standing, they lack statutory standing under Section 1983. As the Supreme Court clarified in Lexmark, the relevant statutory standing inquiry is whether Congress gave the particular class of plaintiffs the right to sue. So that means we look at Section 1983's text. And Section 1983 provides that a state actor who deprives a citizen of any rights secured by the Constitution and laws, quote, shall be liable to the party injured. The statutory text thus indicates that the only party who has a valid Section 1983 claim is the party who has suffered the alleged deprivation of a constitutional right. And in Vote.org, this Court recently said that this interpretation was likely correct and that Section 1983 should likely be interpreted as creating only a cause of action for plaintiffs who have personally suffered the alleged violation. Not only that, this interpretation aligns with the Court's prior precedent. In Coon v. Ledbetter, this Court required plaintiffs who asserted a Section 1983 claim alleging a constitutional violation to show a violation of their personal constitutional rights. In that case, even though a wife suffered harm from witnessing police officers shoot into her trailer home and at her husband, the Court would not let her bring a Section 1983 claim alleging excessive force because they said that she was not asserting a violation of her constitutional rights. This means that even if plaintiffs could show the diversion of resources injury, they would still lack statutory standing to bring all of their 1983 claims because they allege a constitutional deprivation. And even if plaintiffs could show a free speech injury, at most that would give them standing, statutory standing to assert their claim under the residence provision because they do claim that that provision injured their organization's free speech rights. In contrast, they would still lack statutory standing to assert their Section 1983 claims regarding the temporary relocation provision and the P.O. Box provision. And that's because both of their claims about those provisions only argue that those provisions violate the right to vote. But the organizations do not have a right to vote, and so that is not a deprivation of their personal rights. So they would still lack statutory standing under Section 1983 to assert their claims to the temporary relocation provision and the P.O. Box provision. I'm sure you just said this, and maybe it just went over my head, which is possible. Walk me through the scenario where we would say, okay, the organization does have standing to assert its own First Amendment rights because, let's say, hypothetically we would say, okay, this chills their First Amendment rights to advise voters where to register. You know the argument. If we found that, walk me through why they don't have statutory standing under Section 1983 to challenge at least the residence. In that situation, they would have standing to challenge the residence provision because they are arguing that provision also deprived them of their First Amendment rights. Okay. I understand. In contrast, they would not have standing to bring their claims against the temporary relocation provision. All right. Well, I'm glad I asked because I didn't understand. But they would still lack statutory standing to bring their claims against the temporary relocation provision and the P.O. Box provision because their only claim there is that it deprives voters. It unduly burdens voters' rights, and they don't have a right to vote as organizations. Okay. And we also see this in the Supreme Court's opinion in Kahn v. Gabbard. In that case, an attorney was searched while his client was before a grand jury proceeding, and the Supreme Court said that while he could have standing to bring a 1983 claim, arguing that the search violated his Fourth Amendment rights, he did not have standing to bring a 1983 claim arguing that the search of him violated his client's rights. Thank you.  Thank you. Mr. Nkwanta. How badly did I mispronounce your name? That was correct. Oh, wow. See? He's impressed. I told you. I'm impressed. Thank you. Good morning and may it please the Court. I'm Zoma Nkwanta on behalf of Appellees Texas State LULAC and Voto Latino. Plaintiffs agree that Texas citizens should vote where they live, and that has been the law for quite some time. Nobody in this lawsuit disputes that common-sense requirement. To the contrary, this lawsuit challenges provisions of SB 1111 that are overbroad and do just the opposite. They prevent Texans from registering and voting where they live. So the residence restriction prevents Texans from voting and registering where they live if they establish residence for the purpose of influencing the outcome of an election. The county defendants who administer these registration rules testified that influencing the outcome of an election includes activities like voting, working on a campaign, volunteering for a campaign, running for office. The temporary relocation provision prevents individuals from voting where they live because it finds or requires that individuals cannot establish residence at a previous residence unless they presently inhabit that residence and intend to remain. But another provision of the Election Code, Section 1.015D, prevents registrants or individuals from establishing residence at a place where they are at temporarily and do not intend to remain. So, again, it prevents individuals from registering and voting where they live. The PO Box provision does the same, although with a slightly less significant effect. It requires individuals to provide documentation of their residence. It requires a small subset of individuals, but not most, to provide documentation of where they live, which provides additional burdens, additional hurdles. So it's because they registered and voted a commercial PO Box where they don't live. That is correct. Now, the specific injunction that the district court issued was for voters who may have been registered at a PO Box or whose voter registration records show a PO Box, but provided a legitimate residential address. Now, anyone can provide and update their address and provide a legitimate residential address without providing documentation. Even when registering for the first time, the Secretary of State admitted that individuals do not have to provide documentation. So that's the reason why, the small subset of individuals that are required to provide documentation when others are not. But I'd like to jump quickly to Article 3, Standing and Persons. I was about to ask you about that. I appreciate that. We obviously talked to other counsel about this. So on the organizational standing with respect to diversion of resources. So our precedent says that an organization suffers an Article 3 injury when its ability to pursue its mission is perceptibly impaired because it has diverted significant resources to counteract the defendant's conduct. So it would be helpful to me if you could point out what you think the best evidence in the record is, that there's been a diversion of resources here because of 1111 that sort of meets that threshold. Certainly. And before I dive into the record evidence, I want to pick up on something the opposing counsel said. Opposing counsel said that if there was testimony, if there was evidence that resources were diverted specifically because of SB 1111, then we would have standing. Well, we do have that evidence. ROA 1263, Voto Latino's CEO was asked during her deposition what resources they diverted specifically because of SB 1111. And the questioning was specific to SB 1111. And the representative answered they had to reduce their voter contact and outreach and registration in Texas in order to divert funds to educate their voters and volunteers in response to SB 1111. And they had to shut down their voter registration activities and GOTV activities in Colorado in order to divert funds to Texas. This was in response to SB 1111. In ROA 1258 to 1259, Voto Latino again testified about how they reduced the number of low propensity Texas voters they were able to reach by 25 percent in order to divert funds in response to this law. LULAC 1270, ROA 1278 to 1279 testified about how it defunded its immigration reform and criminal justice reform and diverted funds from its annual scholarship program in response to SB 1111. And ROA 1269 to 1270, LULAC testified about how they spent $1 to $2 million because of the residency requirements. And they diverted those funds, some of those funds, from their typical programs which include immigration reform, criminal justice reform, and the annual scholarship program. Now, going back to your initial question, you talked about significant resources and what that means. When court decisions talk about significant resources, what they're really referring to is the impact of that diversion on impairing or requiring organizations to curtail other activities. Because significant for one organization means something different than significant for another organization. It may be a million dollars for one organization, a dollar for another. But the critical fact is whether other programs were impaired or curtailed. And you have extensive testimony about that that I've just described, Voto Latino shutting down its Colorado program, LULAC diverting funds from its immigration reform and criminal justice reform. Those are programs specifically that these organizations had to curtail in response to SB 1111. But what do you do with the testimony that's in the record that says, well, it was for all these bills? Some were in Texas. Some were not in Texas. I mean, that's in the record from your clients. It is in the record that some were because of Texas and some were because of SB 1 and some were because of SB 1111. But the critical testimony is that there was some diversion because of SB 1111. And the critical testimony is that that diversion because of SB 1111, even though other programs also required diversion, but that diversion because of SB 1111 required these organizations to curtail their activities. And all opposing counsel has presented, all the interveners have presented are just disagreements with the testimony, but no contrary evidence. They just disagree with the testimony that LULAC diverted these funds, that Voto Latino diverted these funds because of SB 1111. The testimony is uncontradicted. And there is no requirement to break down or disaggregate any of those funds to specific measures. But how do you distinguish the self-inflicted diversion, these new laws, we've got to go out and educate about this and it's our priority, from, I guess, a threat of actual harm to the organizations? I mean, again, it's got to be a perceptible diversion of resources and the harm's got to be real to the organizations. I mean, just because they're prioritizing re-education or education based on these new laws, is that not a self-inflicted kind of injury that is not enough to give standing? It's not a self-inflicted injury because they also testify that these diversions of resources occurred in order to help their constituents and their volunteers avoid the criminal penalties imposed by the election code. For instance, LULAC testified that they have to educate their volunteer deputy registrars on what to avoid when registering students and other individuals and how to avoid criminal penalties. And we talked a little bit with opposing counsel about how these laws. So I hear you, what you're saying there. But given what you're saying about sort of confusion about what the law means, the district court recognized that there's some tension with the idea that, well, we're not really sure what this law means, but we're having to spend more resources to educate people. So help me, can you resolve that tension for me? Sure. It appears like tension in the abstract. And when you drill down to what is actually being done, you'll see how those two tracks can clearly occur at the same time. So, yes, the speech is chilled because there's a whole category of individuals and voters and a whole category of subjects that they can't speak about. But it requires LULAC and requires Voto Latino to divert more resources to avoid those issues and avoid criminal penalties. In other words, Voto Latino and LULAC have to retool and retrain volunteers to know what not to say. They've got to do that every time the law changes. So I guess you all have standing every time the law changes? Not necessarily. You've got to change your training materials. You've got to update things, your handbooks or whatever you've got, your information. But that happens every time the legislature changes the election code. Well, in this case it's slightly different. I think there are two differences in this instance. The first is the retooling and retraining volunteers is necessary to avoid criminal penalties. So it's not just that they're conducting activities that they normally conduct. They are literally trying to avoid saying something that could trigger criminal liability. But like what? There's an intent requirement under Texas election law. They've got to intentionally and knowingly give false information or cause false registrations or those kinds of things. I'm having trouble struggling to ascertain what the chilled speech is for the organizations. So the chilled speech is under Texas election code 13.007, for instance. It criminalizes a request to another person to make a false statement on a registration application. But it's got to be knowing and intentional. Well, that may be the standard for proving a criminal liability, but that has never been the standard for demonstrating a First Amendment chilled speech liability. And I would point the court to Susan B. Anthony List v. Driehaus, where the defendant actually made the same argument about how the criminal provision or how the laws were imposed a knowing and intent requirement. And the Supreme Court said that the court has never required the defendants or the court has never required the plaintiffs to admit or to acknowledge that they intend to break the law in order to demonstrate that their speech was chilled. And I'll also point to this Court's precedence in Speech First and in a number of other cases where the question is not whether the law, the specific law that chills speech, actually does prevent speech or actually does chill speech. The question is whether it arguably chills speech. In other words, whether the conduct arguably falls within what has been regulated. Remind me, in the Fenves case, the plaintiff was part of the regulated group. In other words, there was a law or policy regulating a specific group of people, and they brought a First Amendment claim. Is it different here because the organizations here are not part of the regulated group? It's the voters or the people who are registering. Doesn't that create a sort of a detachment? It's not entirely different, Your Honor. The individuals who assist voters and individuals who instruct voters on how to register are subject to criminal penalties under 13.007. So Texas law has made it such that the requirements for registration and the requirements for establishing residency are not just imposed on the voters. They're also imposed on those who help the voters because those who help the voters to register are liable for misadvising those voters. So, in other words, they are regulated. They could be if the intent's there and if somehow the conduct of the voter, because the voter ultimately is the master of his or her registration application. So the voter's got to commit fraud or fraudulent registration. Then it's got to be traceable to the organization, and somebody in the Texas enforcement scheme, not the registrars, according to counsel opposite, has to decide to enforce this not only against the voter but against the . . . I mean, there's a lot of steps here before we get to any sort of threat of enforcement against the organizations. Well, before I get to that, I want to pick up on something you said. You said it could be, and that is the question, right, under this Court's precedent in speech first. That is the question. In fact, footnote 10 of that speech, first opinion, rejected the very argument that the law, because the relevant question was whether that law would actually apply to the plaintiff, right, or whether the law would actually apply to the plaintiff. And if it did not, there was no First Amendment injury. The Court said specifically, this Court said this is wrong. The question is whether it arguably prescribes the plaintiff's conduct. But how many could-bes can we stack on top of each other before we get into complete speculation that's not sufficient? Well, let me see if I can cut down on some of those could-bes, because I think there are a couple of additional provisions that help here. So Election Code Provision 15.028 requires the registrar, again, who's responsible for enforcing these voter registration, implementing voter registration applications and rules. They're required to report within 72 hours any instance of which a voter who is not eligible to vote registered to vote or voted in an election. And they're required also to report this to the county district attorney, the secretary of state, and the attorney general with an affidavit stating all the relevant facts. Tell me again, what triggers that duty to report? What triggers that duty to report is when the registrar determines, and it says when the registrar determines, the word of the defendants here, that a person who is not eligible to vote registered to vote or voted in an election. But that's general. So here what we're talking about is residency. Don't live in a commercial P.O. box. Then there's the residency requirement that says you can't go somewhere to register for the purpose of influencing an election, hotel room, maybe it's a campaign worker who comes in, whoever that may be, and then you've got the temporary residence provision. But in every case, those critical factors lodge with the voter. In other words, somehow the registrar's got to ascertain what the intent of the voter is in terms of their residence before they have any cause whatsoever to report anything based on the provisions we're talking about in 1111. Right? And council opposite, if I understand it, says the registrars don't do that. They don't get a registration application and say, gee, I think the voter here must have some sort of fraudulent intent with regard to their residence. Whether the registrar is actually engaged in that activity, that does not. Is there a dispute that they do or don't? I don't think it's in the record. I don't think it's established that no registrar engages in that activity. But even assuming that. I thought the registrars testified that they don't. So the registrars testified that they, some of the registrars testified that they don't. I'm not sure that all the registrars. Is there anybody to contradict them? In other words, what we've got on the record is the registrars who said, we don't do that. We don't look at residents or why they say they reside where they reside. Well, I'll come back to this. Because there are a number of ways a registrar can find out that somebody registered improperly, even without investigating. I'm not saying it can't happen. I'm not saying it can't happen. I'm just saying that this sounds entirely speculative that the registrar is going to say, well, somehow now I know that this voter registered here and it's not really their residence. They don't have the intent to remain. Well, the existence of the law, the existence of that provision, again, under this Court's precedent, is sufficient. And I'll point to this Court. Perhaps it's sufficient for the voter, but we're going a couple steps beyond that. So these associations or organizations are trying to assert standing for the residency provision, for example. If that's sufficient for the voter, it's also sufficient for the organizations because the law also criminalizes the organization's conduct here. But I'll also point to the fact that LULAC testified, there was a testimony from LULAC about their volunteer deputy registrars. And a volunteer deputy registrar, they have volunteers who are volunteer deputy registrars who assist voters in completing registration applications and who submit those applications. Those volunteer deputy registrars are certainly more at risk than just your average citizen who's encouraging people to vote. And that testimony appears, again, in ROA 1269 to 1270. And then you also have instances where it may be more apparent that a voter may be establishing residence for the purpose of influencing the outcome of an election. LULAC testified on those same pages, again, that they have candidate schools sometimes where they provide information to potential candidates and their campaign workers, and they have to change how they speak to those candidates about whether they can move to work on the campaign, where they can vote to work on the campaign, and they have to avoid certain topics because of this law. So there are some more direct links to enforcement here. And the referral procedure, the referral process that the Election Code 15.028 sets forth, that's not unique to this case. There are other cases that have found sufficient chilling effect that have also implemented the same referral procedure. So Susan B. Anthony List, the Ohio Election Commission, had the authority to refer violations of- We're talking about Texas. It's a different set of laws and a different set of enforcement mechanisms from that case. I thought the Ohio Commission there had sort of exclusive jurisdiction over this and had the responsibility to actually conduct hearings, things like that. The registrars don't do that here. Well, that's correct. But what the court found, what moved the needle for the court in terms of finding a threat of enforcement was the potential referral from the commission to law enforcement. And similarly, in Speech First, the campus climate response team did not have any law enforcement authority, but the campus first response team did have the ability to refer certain matters to law enforcement. And because of that, this court found a sufficient threat of criminal prosecution and found that there was a potential chill of speech. And my time is limited. One other thing I'd like to raise because I didn't get a chance to address the discussion on statutory standing, but the cases that opposing counsel has cited lose sight of the fact that this is a First Amendment case. So we've challenged the residence restriction under the First Amendment and all provisions under the First and Fourteenth Amendment, whether it's the right to vote or whether it's a speech restriction. They're all First Amendment claims. You can have another minute. Why don't you give them another minute because I do want to hear what you have to say about the statutory standing, and then I'll give the other side another minute for a vote. Certainly. So it's hornbook law that when you have a First Amendment claim like the ones that we have asserted that challenge certain provisions facially because they chill speech and because they prevent individuals from engaging in First Amendment protected conduct, that this court does not apply those prudential limitations or those prudential requirements. This court has repeatedly allowed individuals to assert those claims on behalf of or assert claims vindicating the constitutional rights of others in the First Amendment context. And that is something that this Court has recognized both in Berea v. City of Houston, even in the case that opposing counsel cited. I believe it's called Net Choice LLC v. Paxton, a recent case that opposing counsel cited in their reply to rebut our arguments. Even that case recognized that the overbreadth doctrine allows individuals to challenge a statute based on a third party's constitutional rights. And that case was a Section 1983 case. So if Section 1983 were as limited as opposing counsel claims, that exception would not be permissible under Net Choice LLC. And even under the broad Supreme Court precedent, for example, you think about cases where booksellers have asserted First Amendment claims on behalf of bookbuyers. I see my time is up. Thank you, Mr. Naquanta. You've done a fine job, and we appreciate your argument. We've got your argument. And, Mr. Wilson, if we'll give Wright six minutes. Mr. Wilson, I don't want to – I mean, I don't want you to say what you want, but Mr. Naquanta gave me some very specific record cites with respect to diversion. And if you had specific responses to those. I was sort of going through some of them as he was giving them. So I want to make sort of a global point on that, and then I'd like to address a couple of them maybe specifically. I think the global point is that we're here on a summary judgment posture. And so insofar as there is conflicting evidence or there are disputes as to, you know, exactly why something – why resources were diverted for what reason, well, the summary judgment is inappropriate because there's a dispute of material fact. You know, I want to point to the Colorado program. Yeah, the Colorado was the first one. One, two, three, six. Six, three. Six, three. I apologize. As I wrote down the – as I was reviewing the records, I wrote down the quotas. SB-1111, SB-1 together, and all the other laws that came into effect post-January. Is that at 1263? I believe that is at 1263. It's certainly in our brief, so if it's not exactly at 1263. Okay, what about the 25%? There was a 25% reduction quote at 1258, 1259. I'm not – I would have to – I think – I believe we've addressed that very specifically. All right. Well, the district court referenced the $1 million to $2 million. I'd like to point out exactly what the district court said there. The district court said they have diverted $1 million to $2 million because of laws like SB-1111. Okay. And we pointed that out in our brief as well. Okay. Well, that's fair enough. Yeah, I know you briefed these. Great. Go ahead. I'd like to address Susan B. Anthony. I think one of the questions was, well, couldn't the election officials in Ohio do a lot of stuff under Susan B. Anthony? That's exactly right, and that's the difference. Here there's a mere referral. In Susan B. Anthony's list, the commission itself could subject the people who were the subject of complaints to expedited and really onerous process, including discovery and things like that. I'd also like to address FENVAS as a chilling effect. I think it's really important. FENVAS, it's a student suing the University of Texas, and the student alleged a chilling effect based on the biased response team. The student is very clearly subject to those sorts of rules, and as I recall that case, there was significant evidence that the biased response team had actually acted on students in various ways. This is just very different because the plaintiffs aren't directly regulated here. My friend on the other side discussed how they're training VDRs and how they have VDRs and things like that. Well, the problem for that argument is the district court said they don't have associational standing, don't have third-party standing, and I don't take them to be cross-appealing that or urging an alternative affirmance on that basis. I'd also like to address the self-inflicted injury point. I mean, I think one of the important things to sort of bear in mind here, as distinguished by a case like perhaps OCA Greater Houston. In OCA Greater Houston, there was evidence that a voter had actually, I don't remember if he had been prevented from voting or just had difficulty voting, and so OCA Greater Houston diverted resources to make sure that didn't happen to someone else. Again, that's not at all the case here where a year in, full discovery gone. They haven't really identified anyone who has been harmed by any of the provisions of SB 1111. I also want to briefly talk about the statutory standing point. My friend on the other side sort of went through a variety of cases. I want to point out that statutory standing, unlike Article III standing, can generally be waived. So we have a footnote in our brief where we go through some of the cases they're talking about. In many of those cases, the issue just wasn't raised at all. I think this Court's recent decision in Vote.org where it discussed, the Court discussed how 1983 likely doesn't create a cause of action to vindicate others' rights, and the Convy-Gabbard case which says that you have to have your own constitutional injury. I think those are very important. So even if the Court disagrees with us on some of the pieces of Article III standing, I think they still have significant issues and we still went on the statutory standing grounds. If the Court has further questions, I'm happy to answer them. If not, I . . . Thank you, Counsel. Thank you for a very well-argued case on both sides, and we appreciate the expedited briefing and all that we had to do. So we'll take the case under submission. And with that, that concludes our oral arguments for this week, and the panel stands in recess. Thank you. Thank you.